JUDGMENT: Judgment reversed and cause remanded.
ATTORNEYS:
 OPINION
Plaintiff-appellant, Linda K. Gross, as administrator of the estate of Jennifer J. Robinson, appeals from the judgment of the Auglaize County Court of Common Pleas granting summary judgment in favor of defendant-appellee, Anthony J. Werling, in a wrongful death action.
The record before this court reveals the following pertinent facts. Defendant, John Pottkotter, met Robinson in Dayton, Ohio, at the Dayton Swim and Social Club on the evening of December 19, 1997. The two were together again the next evening at the club and on December 21, 1997, he invited her to spend a few days with him. Pottkotter testified during his deposition that Robinson had gone home to get "some things" and then followed him in her vehicle. At that time, Pottkotter was living at the residence of Werling, located at 207 South Rauthland Avenue in Wapakoneta, Ohio. Three to four hours after the two arrived at Werling's residence, Werling engaged in a "threesome" with them in his bedroom.
The following morning, Werling engaged in sex with Robinson. Pottkotter stated during his deposition that Robinson was not feeling well that evening. He described her as having the flu on December 23, 1997. Werling gave similar testimony. Pottkotter also testified that before he left on December 24, 1997 at about 1:00 p.m., he had an idea that Robinson had been vomiting. When Werling returned to the residence around 3:30 p.m., Robinson was lying naked in the hallway. Werling said she appeared to be drunk and he helped her into Pottkotter's bedroom. Pottkotter returned to the residence the next day, December 25, 1997, at about 2:00 p.m. and Robinson was lying naked on the floor in his bedroom. She was dead when the emergency squad arrived shortly thereafter.
Appellant brought this wrongful death action against both Werling and Pottkotter. In the complaint, appellant contended Robinson "was becoming increasingly ill due to diabetic ketoacidosis resulting from a lack of insulin injections." The complaint alleged that both defendants negligently caused the death of Robinson by leaving her in a position of peril at a time when she was too sick and too weak to obtain medical care for herself and by secreting her presence by hiding her in a bedroom. In his answer, Werling asserted negligence on Robinson's part.
Werling filed a motion for summary judgment and appellant filed a memorandum contra. On January 5, 1999, the trial court granted summary judgment in favor of Werling. Specifically, the trial court found that Robinson was a social guest of Pottkotter and a licensee of Werling. The trial court further found that even assuming Werling's negligence, Robinson was more than fifty percent negligent as a matter of law. The court based its finding that the negligence of Robinson was greater upon her failure to notify Werling of her diabetes and her failure to follow her own diabetes regimen. On January 25, 1999, the trial court issued a judgment entry ruling that it was indefinitely continuing the trial relative to Pottkotter pending this appeal.
Appellant's sole assignment of error asserts as follows:
 The trial court erred [in] granting summary judgment [to] appellee Anthony J. Werling when there was a factual dispute as to the percentage of negligence (comparative negligence) of decedent Jennifer J. Robinson and appellee Anthony J. Werling.
Civ.R. 56(C) specifically provides that before summary judgment may be granted, it must be determined that: (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made.
To establish actionable negligence, a plaintiff must show a duty, a breach of that duty, and an injury proximately resulting therefrom. Mussivand v. David (1989), 45 Ohio St.3d 314, 318. In cases of premises liability, the status of the person who enters upon the land of another defines the scope of the legal duty that the landowner owes the entrant. Gladon v. Greater Cleveland Regional Transit Auth. (1996), 75 Ohio St.3d 312, 315.
In her assignment of error, appellant contends the trial court erred in determining that Robinson was a licensee so far as the liability of Werling was concerned. Appellant argues that Robinson was a social guest of Werling. We agree.
"The philosophy underlying all the decisions with respect to host and guest relationships is that the host extends his hospitality to the guest and that the guest accepts hospitality." Scheibel v. Lipton (1951), 156 Ohio St. 308, 330. There must be evidence of the host's actual invitation to the guest, express or implied. See Williams v. Cook (Mar. 30, 1999), Paulding App. No. 11-98-8, unreported, at *4; Starost v. Bradley (Jan. 29, 1999), Montgomery App. No. 17319, unreported, at *3, citing Scheibel, supra. On the basis of that invitation, a social guest is thought to be on the premises presumably giving the possessor some personal benefit, intangible though it may be. See White v. Brinegar (June 1, 1994), Summit App. No. 16429, unreported, at *2; Hamm v. Heritage Professional Services, Inc. (Apr. 9, 1993), Scioto App. No. 92CA2082, unreported, at *4. A host owes an invited social guest the duty "(1) to exercise ordinary care not to cause injury to his guest by any act of the host or by any activities carried on by the host while the guest is on the premises, and (2) to warn the guest of any condition of the premises which is known to the host and which one of ordinary prudence and foresight in the position of the host should reasonably consider dangerous, if the host has reason to believe that the guest does not know and will not discover such dangerous condition." Scheibel at paragraph three of the syllabus.
Conversely, a licensee is "a person who enters the premises of another by permission or acquiescence, for [her] own pleasure or benefit, and not by invitation[.]" Provencher v. Ohio Dept. of Transp. (1990), 49 Ohio St.3d 265, 266 (Emphasis added). Ordinarily, a landowner owes no duty to a licensee except to refrain from willful, wanton or reckless conduct which is likely to injure her. Gladon, supra, at 317. Willful conduct implies intent, purpose or design to injure. Id. at 319. Wanton conduct involves the failure to exercise any care whatsoever toward those to whom he owes a duty of care, and his failure occurs under the circumstances in which there is great probability that harm with result. Furthermore, when a licensee is discovered in a position of peril, the landowner is required to use ordinary care to avoid injuring her. Id. at 318.
In the present case, the record reflects that on the evening before Robinson would have an express invitation from Pottkotter to stay at Werling's house, Werling went to the Dayton Swim and Social Club, but he did not enter because he had been told Pottkotter was not at that club. Werling testified that the people had answered the door either in their underwear or without clothes. According to Pottkotter, Robinson went pursuant to his invitation to Werling's house after they had, in fact, talked about a threesome with his housemate, Werling. Furthermore, Werling's deposition testimony establishes there was apparently an early conversation exchanged with Robinson indicating that she was a social guest of Werling leading to the sexual activity with her in his bedroom about three or four hours after she arrived at the house. Construing that evidence most favorably to appellant, we conclude that reasonable minds could find that an invitation from Werling to Robinson existed under these circumstances.
However, Robinson may exceed the scope of her invitation and lose her status as a social guest for purposes of determining the duty owed to her by Werling. See Gladon v. Greater Cleveland Regional Transit Auth., 75 Ohio St.3d at 316-317. During his deposition, Werling stated that on December 23, 1997 at around midnight, he had told Pottkotter that Robinson needed to leave the premises. According to Pottkotter, it was more of a discussion regarding Robinson's plans. Pottkotter assumed it concerned Werling because his girlfriend was coming over to the house the next day. Pottkotter testified that at that time, he told Werling to let Robinson stay at the residence because she was sick and Werling then "really couldn't respond" to it. Werling denied having any discussion regarding Robinson being sick.
In the early morning hours of December 24, 1997, Robinson apparently got into Werling's bed. Werling testified that she spilled ice water on him and he told her it was time for her to leave. Pottkotter's testimony seemed to substantiate only that Werling complained about the fact that Robinson was in his bed, although he did recall Werling stating that if Robinson was not gone when he got home from work, that Pottkotter would have to leave. Pottkotter refused to tell Robinson she needed to leave because of her being sick.
Werling further testified, however, that the first time he specifically told Robinson to leave "his house" was when he subsequently saw her lying naked in the hallway upon coming home from work on Christmas Eve afternoon. Werling then took her into Pottkotter's bedroom and left shortly thereafter with his girlfriend for the rest of the day through December 25, 1997, the day Robinson died.
After construing the facts most favorably to appellant, we find that the determination of Robinson's status on the property at the time of her death as either a social guest or a licensee depends entirely upon credibility determinations suitable only for a trier of fact. Accordingly, a genuine issue of material fact also exists as to whether Werling breached the corresponding duty of care owed to Robinson which is contingent upon her status on the property.
Appellant also argues that the determination of the issue of comparative negligence in this case was a genuine issue of material fact for a trier of fact. We agree. In addressing the propriety of summary judgment in a comparative negligence case, this court has previously held that:
 [S]ummary judgment is properly granted in favor of the defendant in a comparative negligence case where, pursuant to the criteria of Civ.R. 56(C), the court can make any one of the following determinations as a matter of law: either, (1) the defendant was not negligent; or (2) the defendant's negligence, if any, was not the proximate cause of plaintiff's injury (such as where the plaintiff's own negligence was the sole proximate cause of the injury) or (3) the plaintiff's own negligence, (considering factors of assumption of the risk, if any), outweighed any negligence of the defendant under R.C. 2315.19.[1] (Emphasis sic.)
Mowery v. McCracken (Aug. 31, 1987), Hancock App. No. 5-85-33, unreported, at *3. In Mowery, at *4-6, this court recognized that the ability of the plaintiff to avoid a known peril has consistently been an important factor in evaluating or weighing contributory negligence for summary judgment purposes. Contributory negligence is "any want of ordinary care on the part of the person injured, which combined and concurred with the defendant's negligence and contributed to the injury as a proximate cause thereof, and as an element without which the injury would not have occurred. Brinkmoeller v. Wilson (1975),41 Ohio St.2d 223, 226." Crawford v. Halkovics (1982), 1 Ohio St.3d 184,186.
In the instant case, Dr. Mickey Denen testified by deposition that he had treated Robinson for insulin-dependent diabetes mellitus on several prior occasions. As to Robinson's specific condition at the time in question, she was prescribed fourteen units of long-acting insulin before each evening meal and as many as four doses of regular insulin each day depending upon her blood sugar levels before meals and a bedtime snack. Dr. Denen believed that Robinson understood that her life depended on injecting insulin based on her own medical history.
Dr. Denen's recitation of that medical history revealed that Robinson was hospitalized in April 1996 for diabetic ketoacidosis resulting from her failure to take insulin. Dr. Denen also described the condition of diabetic ketoacidosis, or high blood sugar. It is a biochemical phenomenon where there is insufficient insulin in the body. Typical symptoms of ketoacidosis include nausea and vomiting. Again in July 1996, Robinson had gone to a hospital emergency room and was concerned she was suffering from diabetic ketoacidosis. She had been vomiting and had symptoms of dehydration and lightheadedness. Robinson had not taken her insulin for at least thirty-six hours. Dr. Denen also noted that Robinson probably had ketoacidosis when he referred her to a hospital emergency room in February 1997. She was experiencing symptoms of nausea and vomiting. Again, the long-acting insulin had not been taken for three days and her blood sugar level was greater than five hundred.
Based upon his review of the coroner's report, Dr. Denen stated that Robinson suffered from a lack of insulin at the time she died and that this condition was the proximate cause of her death. Dr. Denen believed that Robinson was more than fifty percent responsible for her own medical care. Dr. Denen also opined that persons who begin to experience ketoacidosis would most of the time still be able to talk, would understand people talking to them, and would be able to basically ask for medical care or help.
The record also includes Dr. Denen's opinion based on several sources, including both his knowledge of Robinson's medical history, ketoacidosis, as well as a summary of Werling's deposition testimony, that Werling should have been able to ascertain that some sort of medical attention was required. Additionally, he stated that in his opinion if medical attention had been sought for Robinson, she would not have died.
In addition to the foregoing medical opinions, Werling's deposition testimony indicates that on the day before Robinson's death, his mother had come to the residence around 10:00 a.m. When his mother arrived, Robinson was still in his bed and was making noise so loud that his mother questioned him. Werling said Robinson was moaning or snoring. He admitted, however, to never using the word "snore" during the police investigation. Werling further testified that upon coming home from work that afternoon, he saw Robinson lying naked on her side on the hallway floor. He stated that he thought she was on her way to the bathroom when she passed out drunk. However, despite his statement that Robinson appeared to be drunk, he had not smelled alcohol on her breath. Werling then helped her into Pottkotter's bedroom. Specifically, Werling testified that he pulled her up and she "swaggered" and crawled as she was helped into the bedroom. When he closed the bedroom door, she was lying on the floor. His testimony indicated that no telephone was in that bedroom. Werling left shortly thereafter and was gone the rest of the evening and the next day, the day Robinson died.
In sum, the deposition testimony of Dr. Denen opined that Robinson should have known of her condition and could have been able to ask for help up to a certain point and that Robinson was therefore more than fifty percent responsible for her own care in this situation. However, we believe that the accuracy and the certainty of those conclusions as to what actually happened in the house during the critical time frame necessarily requires a factual determination based upon all of the surrounding circumstances — including, in particular, the credibility of Werling's statement that she had not told him that she was a diabetic and that Werling was never otherwise made aware of the seriousness of Robinson's condition when he left her in the house naked on the floor of a bedroom in an obviously incapacitated condition.
Although typically credibility issues arise in summary judgment proceedings when statements are in conflict over a fact to be proved, Turner v. Turner (1993), 67 Ohio St.3d 337, 341-342, credibility concerns can also be present where, on the face of the evidentiary documentation supporting a summary judgment motion, the moving party's evidence on a factual issue appears to be uncontroverted. Killilea v. Sears, Roebuck Co. (1985),27 Ohio App.3d 163, 167-168. This is true, in particular, where under the circumstances, credibility is manifestly critical to a determination that there is no genuine issue as to the existence of that fact. Id. Here, the trial court's decision necessarily depends upon accepting the credibility of Werling's deposition statement that he was not notified that Robinson was a diabetic and accepting Dr. Denen's speculation about what Robinson should have known or done about her own condition. In essence, the trial court had to determine that his statement was credible in order to find no genuine issue of material fact. Because Werling was a defendant, his potential interest in obtaining his discharge from liability for Robinson's death is evident. Finally, while not directly pertinent here, there is other evidence in the record tending to establish a genuine issue of material fact, which upon trial could be admitted in the appropriate circumstances.[2]
In sum, construing the evidence most strongly in appellant's favor, we cannot concur with the trial court that under these circumstances Robinson's own negligence either proximately caused her death or outweighed any negligence or recklessness on the part of Werling as a matter of law. Appellant's sole assignment of error is sustained.
Accordingly, the judgment of the trial court is reversed and the matter remanded to the trial court for further proceedings consistent with this opinion.
Judgment reversed and cause remanded.
BRYANT, P.J., concurs.
[1] R.C. 2315.19(C) provides: "If the percentage of the negligence * * * that is attributable to the plaintiff * * * is greater than the total of the percentages of the negligence that is attributable to all parties from whom the plaintiff seeks recovery * * * the court shall enter judgment in favor of those parties."
[2] The Vanovers' affidavits offered by appellant indicated that Werling knew that Robinson had a "medical problem." The affidavits also stated: "[O]n the Wednesday before Christmas TJ Werling kicked [Robinson] trying to get her to move out of the hallway because TJ Werling's girlfriend was coming over and he didn't want her to see [Robinson] at his house."